# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**CRYSTAL ELAINE BURKHOLDER,**

      **Plaintiff,**

     **vs.**                                           **Civ. No. 16-1403 KK**

**NANCY A. BERRYHILL,[1]**
**Acting Commissioner of Social Security,**

      **Defendant.**

## <u>MEMORANDUM OPINION AND ORDER</u>[2]

    **THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 17) filed May 22, 2017, in support of Plaintiff Crystal Elaine Burkholder's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title XVI supplemental security income benefits. On August 28, 2017, Plaintiff filed her Motion to Remand or Reverse ("Motion"). (Doc. 24.) The Commissioner filed a Response in opposition on October 13, 2017 (Doc. 26), and Plaintiff filed a Reply on November 13, 2017. (Doc. 27.) The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c). Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is well taken and is **GRANTED.**

---

[1] Pursuant to Fed. R. Civ. P. 25(d), Nancy A. Berryhill is substituted for Carolyn Colvin as the Acting Commissioner of the Social Security Administration. Fed. R. Civ. P. 25(d).

[2] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case. (Docs. 4, 9, 11.)

# I. <u>Background and Procedural Record</u>

Claimant Crystal Elaine Burkholder ("Ms. Burkholder") alleges that she became disabled on February 6, 2013, at the age of twenty-six because of depression, learning disability, anxiety and separation issues. (Tr. 175-76, 179.[3]) Ms. Burkholder completed the tenth grade,[4] and worked as a grocery store cashier, fast food helper, and department store inventory control peer. (Tr. 180.)

On February 6, 2013, Ms. Burkholder protectively filed an application for Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1381 et seq. (Tr. 150-56, 175.) Ms. Burkholder's application was initially denied on August 27, 2013. (Tr. 60-71, 72, 90-93.) It was denied again at reconsideration on November 4, 2013. (Tr. 73-86, 87, 97-101.) On December 3, 2013, Ms. Burkholder requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 103-05.) ALJ Barry O'Melinn conducted a hearing on July 27, 2015. (Tr. 28-55.) Ms. Burkholder appeared in person at the hearing with attorney Michelle Baca. (*Id*.) The ALJ took testimony from Ms. Burkholder (Tr. 34-51), and an impartial vocational expert ("VE"), Leslie White. (Tr. 51-54.) On October 14, 2015, the ALJ issued an unfavorable decision. (Tr. 9-23.) On November 9, 2016, the Appeals Council issued its decision denying Ms. Burkholder's request for review and upholding the ALJ's final decision. (Tr. 1-6.) On December 27, 2016, Ms. Burkholder timely filed a Complaint seeking judicial review of the Commissioner's final decision. (Doc. 1.)

---

[3] Citations to "Tr." are to the Transcript of the Administrative Record (Doc. 17) that was lodged with the Court on May 22, 2017.

[4] Ms. Burkholder testified and reported to David LaCourt, Ph.D., that she completed half of the twelfth grade (Tr. 35, 284); she reported to Carol Hunter, CNP, that she dropped out of high school in the eleventh grade (Tr. 465); she reported to Drs. Robert J. Thoma and Taryn E. Goff that she attended high school until the tenth grade and left school when her mother was going through serious medical issues, but that she returned and completed half of her twelfth grade year and formally dropped out after the birth of her first child (Tr. 473).

## II. Applicable Law

### A. Disability Determination Process

An individual is considered disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382(a)(3)(A). The Social Security Commissioner has adopted the familiar five-step sequential analysis to determine whether a person satisfies the statutory criteria as follows:

(1) At step one, the ALJ must determine whether the claimant is engaged in "substantial gainful activity."[5] If the claimant is engaged in substantial gainful activity, she is not disabled regardless of her medical condition.

(2) At step two, the ALJ must determine the severity of the claimed physical or mental impairment(s). If the claimant does not have an impairment(s) or combination of impairments that is severe and meets the duration requirement, she is not disabled.

(3) At step three, the ALJ must determine whether a claimant's impairment(s) meets or equals in severity one of the listings described in Appendix 1 of the regulations and meets the duration requirement. If so, a claimant is presumed disabled.

(4) If, however, the claimant's impairments do not meet or equal in severity one of the listing described in Appendix 1 of the regulations, the ALJ must determine at step four whether the claimant can perform her "past relevant work." Answering this question involves three phases. *Winfrey v. Chater*, 92 F.3d 1017, 1023 (10th Cir. 1996). First, the ALJ considers all of the relevant medical and other evidence and determines what is "the most [claimant] can still do despite [her physical and mental] limitations." 20 C.F.R. § 416.945(a)(1). This is called the claimant's residual functional capacity ("RFC"). *Id.* § 416.945(a)(3). Second, the ALJ determines the physical and mental demands of claimant's past work. Third, the ALJ determines whether, given claimant's RFC, the claimant is capable of

---

[5] Substantial work activity is work activity that involves doing significant physical or mental activities. 20 C.F.R. § 416.972(a). Work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before. *Id.* Gainful work activity is work activity that you do for pay or profit. 20 C.F.R. § 416.972(b).

meeting those demands.  A claimant who is capable of returning to past relevant work is not disabled.

(5)       If the claimant does not have the RFC to perform her past relevant work, the Commissioner, at step five, must show that the claimant is able to perform other work in the national economy, considering the claimant's RFC, age, education, and work experience.  If the Commissioner is unable to make that showing, the claimant is deemed disabled. If, however, the Commissioner is able to make the required showing, the claimant is deemed not disabled.

*See* 20 C.F.R. § 416.920(a)(4) (supplemental security income disability benefits); *Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005); *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).  The claimant has the initial burden of establishing a disability in the first four steps of this analysis.  *Bowen v. Yuckert*, 482 U.S. 137, 146, n.5, 107 S.Ct. 2287, 2294, n. 5, 96 L.Ed.2d 119 (1987).  The burden shifts to the Commissioner at step five to show that the claimant is capable of performing work in the national economy.  *Id.*  A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis.  *Casias v. Sec'y of Health & Human Serv.*, 933 F.2d 799, 801 (10th Cir. 1991).

      **B.**      <u>**Standard of Review**</u>

This Court must affirm the Commissioner's denial of social security benefits unless (1) the decision is not supported by "substantial evidence" or (2) the ALJ did not apply the proper legal standards in reaching the decision. 42 U.S.C. § 405(g); *Hamlin v. Barnhart*, 365 F.3d 1208, 1214 (10th Cir. 2004); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004); *Casias,* 933 F.2d at 800-01. In making these determinations, the Court "neither reweigh[s] the evidence nor substitute[s] [its] judgment for that of the agency.'" *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008).  A decision is based on substantial evidence where it is supported by "relevant evidence . . . a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118.  A decision "is not based on substantial evidence if it is overwhelmed

by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or "constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992). The agency decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996).

## III. Analysis

The ALJ made her decision that Ms. Burkholder was not disabled at step five of the sequential evaluation. Specifically, the ALJ found that Ms. Burkholder had not engaged in substantial gainful activity since her alleged onset date of February 6, 2013,[6] and had severe impairments of major depressive disorder, generalized anxiety disorder, post-traumatic stress disorder, and learning disorder that did not meet or medically equal the severity of a listing. (Tr. 14-15.) He found that Ms. Burkholder had the residual functional capacity to perform a full range of work at all exertional levels, but that she had the following nonexertional limitations:

> she can understand, carry out, and remember simple instructions and make commensurate work related decisions; can respond appropriately to supervision, co-workers, and work situations. She is able to deal with routine changes in the work setting and maintain concentration, persistence, and pace for up to and including two hours at a time, with normal breaks throughout the workday. She should have no interaction with the public. Work can be around co-workers throughout the day, but should require no more than occasional interaction with co-workers.

---

[6] There is no retroactivity for Title XVI payments. Therefore, the earliest possible established onset date in a Title XVI claim is the application filing date or protective filing date. *See* POMS DI 25501.370.A.1. – *The Established Onset Date for Title XVI Claims.*

(Tr. 16.) The ALJ determined that Ms. Burkholder had no past relevant work experience. (Tr. 22.) Based on the RFC and the testimony of the VE, the ALJ concluded that there were jobs that existed in significant numbers in the national economy that Ms. Burkholder could perform. (Tr. 22-23.) For this reason, the ALJ determined that Ms. Burkholder was not disabled. (Tr. 23.)

In support of her Motion, Ms. Burkholder asserts (1) that the ALJ failed to use correct legal standards in weighing the medical source evidence; and (2) that the ALJ failed to resolve the conflict between the VE testimony and the reasoning level of the jobs identified, which Ms. Burkholder alleges exceeds the ALJ's RFC. (Doc. 24 at 5-20.) The Court finds grounds for remand as discussed below.

### A. **Medical Evidence**

#### 1. **Partners in Wellness**

New Mexico Children, Youth, and Families Department ("CYFD") referred Ms. Burkholder to Partners in Wellness after she was accused of child abuse and neglect. (Tr. 288-304.) CYFD had removed Ms. Burkholder's children from her, and her participation in parenting classes, anger management classes, and individual counseling was a condition of having her children returned. (*Id.*) On February 27, 2013, LPCC Christina Bryant did an intake. (*Id.*) Ms. Burkholder reported she was diagnosed with a learning disability in elementary school, that she attended special education classes full time, and that she left school in her junior year. (Tr. 295-96.) She reported difficulties with memory and exhibited poor insight and judgment. (Tr. 293.) She reported a history of auditory hallucinations, having last heard voices in her head about a year prior. (Tr. 288, 293) She stated that taking Risperdal stopped the voices. (*Id.*) She also reported a history of suicidal ideation, with the most recent occurring in relation to her not having her children in the days prior to intake. (*Id.*)

LPCC Bryant assessed Axis I diagnoses of major depression disorder, single episode, severe, adjustment disorder with anxiety, and parent/child problems. (Tr. 288-89.) She assigned a GAF score of 35.[7] (Tr. 291.) LPCC Bryant noted that Ms. Burkholder was Core Service Agency (CSA) eligible with a GAF of 35 and due to her recent suicidal ideations, depression, anxiety, indicators of codependency, history of psychosis, and function impairments.[8] (*Id.*) Ms. Burkholder declined CSA services. (*Id.*)

### a. Individual Counseling

### (1) Brandy Samaniego, LISW

On March 8, 2013, Ms. Burkholder began individual counseling sessions with Brandy Samaniego, LISW. (Tr. 354.) She attended seventeen individual counseling sessions with LISW Samaniego over the course of five months, from March 8, 2013, through August 7, 2013, while at Partners in Wellness.[9] (Tr. 354, 355, 360, 363, 366, 372, 380, 387, 394, 407, 410, 413, 418, 419, 422, 424, 425.) LISW Samaniego noted, *inter alia*, that Ms. Burkholder was not taking responsibility for her situation and was blaming others (Tr. 354, 360); that her progress was slow, and that her learning disability and lack of common sense was causing her to make poor decisions (Tr. 363, 366, 407, 422, 424); that she had real parenting deficits (Tr. 380, 387, 410); and that Ms. she struggled with aggression (Tr. 419). LISW Samaniego also noted that

---

[7] The GAF is a subjective determination based on a scale of 100 to 1 of "clinician's judgment of the individual's overall level of functioning." *Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders* (4th ed. 2000) at 32. GAF score of 31-40 indicates some impairment in reality testing or communication (*e.g.,* speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (*e.g.,* depressed man avoids friends, neglects family, and is unable to work; child frequently beats up younger children, is defiant at home, and is failing at school). *Id.* at 34.

[8] Her function impairments were lack of ongoing psychiatric evaluation for medications, lack of maintaining safety, legal involvement, maintaining a household for her children, educational, and employment. (Tr. 291.)

[9] Ms. Burkholder attended an additional seven sessions with LISW Samaniego from October 4, 2013, through June 5, 2014, at Agave Health, Inc. (Tr. 429, 430, 434, 435, 436, 437, 438.) On August 9, 2013, Partners in Wellness ceased operating and Agave Health, Inc., took over as the new business entity operating the former Partners in Wellness site. (Tr. 321.)

Ms. Burkholder was attempting, along with her mother, to keep their house clean (Tr. 363, 372); and that she was demonstrating increased awareness and was trying to be a more responsible parent (Tr. 413).

On July 22, 2015, LISW Samaniego prepared a Clinical Assessment of Ms. Burkholder. (Tr. 493-97.) LISW Samaniego stated in relevant part that

> [t]his provider has had a fairly long history with the client and has always suspected either an autism spectrum diagnosis or cognitive disorder diagnosis. The client presents physically as a normal 28 year old woman, however, one could tell fairly quickly into conversation, that she has some deficits, though it is difficult to pinpoint exactly what they are. Clearly, [Ms. Burkholder's] decision-making abilities have affected her; however, she has demonstrated motivation and determination in the area of her children and is dedicated to getting their lives back to "normal." [Ms. Burkholder's] attempts to do everything that is asked of her, however, due to her impulsivity, she can often become impatient when dealing with others, and this comes off as uncooperative or angry.
>
> . . .
>
> In this provider's experience of the client, and per her own report, she is impulsive, quick to anger, has trouble with comprehension in most situations, does not always think through situations or is able to foresee all possible consequences, odd affect, immature for her age, and borderline intellectual functioning.

(Tr. 496-97.) LISW Samaniego noted an Axis I diagnosis of Mood Disorder, NOS; an Axis II diagnosis of Borderline Intellectual Functioning; and assessed a GAF score of 50.[10]

The ALJ did not evaluate or discuss LISW Samaniego's assessment. He did, however, generally refer to the Partners in Wellness records,[11] and specifically referenced in his determination only two of LISW Samaniego's treatment notes. In the first reference, the ALJ stated that

---

[10] A GAF score of 41-50 indicates serious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job). *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders*, 32, 34 (4th ed. 2000).

[11] Noting that CYFD required Ms. Burkholder to attend counseling and parenting classes in order to get her children back, the ALJ summarily concluded that the Partners in Wellness records demonstrated that once CYFD returned her children, Ms. Burkholder's symptoms improved. (Tr. 18-19.)

[Ms. Burkholder] was angry and depressed over the removal of her children, but she met all the demands required by CYFD, and in turn, she was able to have her children returned. Licensed social worker, Brandy Samaniego, noted on July 3, 2013, that she has seen significant improvement in her anger and demonstrating increased responsibility.

(Tr. 18.) The ALJ referenced LISW Samaniego's treatment notes a second time in his determination when discussing Ms. Burkholder's credibility. He stated that

[f]inally, notes from Ms. Samaniego dated May 24, 2013, reflect that [Ms. Burkholder] attempted to get out of doing community service and finding a job as part of the condition of her probation, by asking Ms. Samaniego to state she is unable to work. She stated she does not want to work because she does not want to leave her children with her mother, as she is "too old." Ms. Samaniego reminded her that she has never presented too impaired to work or do community service, and that the question would be the level of job or responsibility she could do due to her learning disorder, but not that she could not do anything at all.

(Tr. 21.)

### (2)     Annabelle Perez, CSW

On March 13, 2013, Ms. Burkholder also began individual counseling sessions with Annabelle Perez, CSW. (Tr. 356.) She attended sixteen individual counseling sessions with CSW Perez over the course of four months, from March 13, 2013, through July 24, 2013. (Tr. 356, 357, 367, 369, 375, 376, 379, 383, 386, 390, 393, 409, 416, 420, 421, 423.) CSW Perez noted, *inter alia*, that Ms. Burkholder would be learning about safe coping and planning, and applying for jobs (Tr. 356); and that Ms. Burkholder wanted to go to school, get her GED, find a job, and find daycare for her children (Tr. 379, 409, 416). CSW Perez also noted that Ms. Burkholder required assistance with parenting and completing applications for her children's SSI benefits, Team Builders and IEP papers (Tr. 376, 383, 386, 390); that her anger steers her off course, she had difficulty with coping strategies, and she was unable to detect warning signs and triggers (Tr. 367, 369, 393); and that she was noncompliant with what was being asked of her by her probation officer and CYFD (Tr. 421, 423).

The ALJ did not specifically reference any of CSW Perez's treatment notes.

### b.    Parenting Classes

Ms. Burkholder attended twelve parenting classes from March 20, 2013, through June 19, 2013, with LMSW Deanna Sanchez or LISW Patricia Grana. (Tr. 358, 362, 365, 370, 374, 378, 382, 385, 389, 392, 406, 411, 414.) Treatment notes indicated that Ms. Burkholder seemed to understand that she needed to be more involved in her children's lives (Tr. 358); that values are demonstrated by example (Tr. 362, 382); that it is not okay to abuse a child regardless of the reason (Tr. 365); that rules and consistency are important (Tr. 370, 378); that children learn through play (Tr. 378, 392); and that there are other ways to deal with bad behaviors other than losing control (Tr. 406).

The ALJ generally referenced the Partners in Wellness records and did not specifically reference any of the parenting class treatment notes.[12]

### c.    Anger Management Classes

Ms. Burkholder attended twelve anger management classes from March 25, 2013, through June 24, 2013, with LPCC James Dudley or LMSW Deanna Sanchez. (Tr. 361, 364, 368, 377, 381, 384, 388, 391, 405, 408, 412, 415.) Treatment notes indicate that Ms. Burkholder appeared to be in the role of the victim (Tr. 368); that the therapist questioned Ms. Burkholder's understanding of anger management (Tr. 377); that she seemed to understand the difference between getting angry and expressing anger (Tr. 381); that Ms. Burkholder was unable to identify how she would address anger triggers (Tr. 388); that she appeared to have a limited ability to identify a new way of handling anger (Tr. 391); that she did not indicate any application of skills to reduce anger responses (Tr. 405); that Ms. Burkholder did not indicate any changes in her responses to anger triggers and that the therapist voiced concerns because

---

[12] *See* fn. 11, *supra*.

Ms. Burkholder only had two more sessions left in the group (Tr. 408); and that, although Ms. Burkholder self reports that her actions have shown improved anger management, her reports of anger do not demonstrate much improvement and indicate that she is still aggressive in nature (Tr. 412, 415).

The ALJ did not specifically reference any of the anger management class treatment notes.

### 2.    State Agency Examining Psychological Consultant David LaCourt, Ph.D.

On July 31, 2013, Ms. Burkholder presented to David LaCourt, Ph.D., for a psychological evaluation at the request of Disability Determination Services.   (Tr. 284-86.) Dr. LaCourt noted background information to include that Ms. Burkholder (1) attended school through about half of the twelfth grade and received special education in the area of reading; (2) left school when she became pregnant with her first child; (3) is single with three children; (4) had recently regained physical custody of her oldest son who had been in treatment foster care for behavioral issues; (5) had been convicted of, and was on probation for, the crime of contributing to the delinquency of a minor; (6) has a limited work history, with her last being employment seven years prior to presentation; (7) was not working because she did not have reliable transportation; (8) has a history of audible hallucinations; and (9) has a history of generalized anxiousness.  (Tr. 284-85.)

Dr. LaCourt observed that (1) Ms. Burkholder was oriented to time, place, person, and the general situation; (2) her attention and eye contact was in the normal range; (3) her recall and memory as sampled were grossly intact; (4) her fund of general information was in the low average to average range; and (5) she has "average intellectual functioning, possibly decremented functionally into the low average range, as associated with active psychotic

process." (Tr. 285.) Dr. LaCourt's DSM-IV diagnostic impression was "Schizophrenia, paranoid type." (Tr. 286.) He assessed that Ms. Burkholder had *no limitation* with very short/simple instructions. (Tr. 286.) He assessed *mild limitations* in (1) understanding and remembering detailed/complex instructions; (2) attending and concentrating; (3) social interaction with the public; (4) adaptation to changes in the workplace; and (5) awareness of normal hazards/reacting appropriately in the workplace. (*Id.*) He assessed *moderate limitations* in Ms. Burkholder's ability to (1) carry out tasks; and (2) have social interaction with co-workers. (*Id.*) He assessed *marked limitations* in Ms. Burkholder's ability to have social interactions with supervisors. (*Id.*)

The ALJ summarized Dr. LaCourt's exam notes and assessment and stated, "I have given his conclusions some weight, consistent with my decision herein." (Tr. 19.)

### 3. State Agency Nonexamining Psychological Consultant Elizabeth Chiang, M.D.

On August 20, 2013, State agency nonexamining psychological consultant Elizabeth Chiang, M.D., reviewed Ms. Burkholder's records at the initial level of evaluating Ms. Burkholder's disability claim.[13] (Tr. 65-67, 67-70.) Dr. Chiang prepared a Psychiatric Review Technique Form ("PRTF")[14] and a Mental Residual Functional Capacity Assessment ("MRFCA"). (*Id.*) In Section I of the MRFCA, Dr. Chiang assessed that Ms. Burkholder was

---

[13] Dr. Chiang reviewed the Disability Report, school testing records, Southwest Medical Associates records, Partners in Wellness records, Dr. David LaCourt's records, and the adult function reports. (Tr. 66.)

[14] "The psychiatric review technique described in 20 CFR 404.1520a and 416.920a and summarized on the Psychiatric Review Technique Form (PRTF) requires adjudicators to assess an individual's limitations and restrictions from a mental impairment(s) in categories identified in the "paragraph B" and "paragraph C" criteria of the adult mental disorders listings. The adjudicator must remember that the limitations identified in the "paragraph B" and "paragraph C" criteria are not an RFC assessment but are used to rate the severity of mental impairment(s) at steps 2 and 3 of the sequential evaluation process." SSR 96-8p, 1996 WL 374184, at *4. Dr. Chiang assessed that Ms. Burkholder had mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence and pace; and no repeated episodes of decompensation. (Tr. 65.)

not significantly limited in her ability (1) to understand and remember detailed instructions; (2) to carry out detailed instructions; (3) to maintain attention and concentration for extended periods; (4) to sustain an ordinary routine without special supervision; (5) to make simple work-related decisions; (6) to interact appropriately with the general public; (6) to ask simple questions or request assistance; (7) to travel in unfamiliar places or use public transportation; and (8) to set realistic goals or make plans independently of others.  (Tr. 67-69.)  Dr. Chiang assessed that Ms. Burkholder was *moderately limited* in her ability to (1) work in coordination with or in proximity to others without being distracted by them; (2) to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (3) to accept instructions and respond appropriately to criticism from supervisors; (4) to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and (5) to respond appropriately to changes in the work setting.  (*Id.*)  In Section III of the MRFCA, Dr. Chiang explained that

> claimant can understand, remember and carry out simple instructions, make simple decisions, attend and concentrate for two hours at a time, interact adequately with co-workers and supervisors and respond appropriately to changes in a routine work setting.

(Tr. 69.)[15]

> The ALJ did not discuss Dr. Chiang's or Dr. Atkins' opinions, but stated that

> [t]he opinions of state agency medical consultants are internally consistent and consistent with the evidence as a whole, therefore are entitled to significant weight (Exhibits B2A and B4A).  Thus, I have effectively adopted the residual functional capacity as determined by the State agency medical consultants.

(Tr. 22.)

---

[15] On November 4, 2013, State agency nonexamining psychological consultant Howard Atkins, Ph.D., affirmed Dr. Chiang's assessment as written.  (Tr. 84.)

### 4. Agave Health, Inc. (f/k/a Partners In Wellness)[16]

Ms. Burkholder continued individual therapy primarily with LISW Samaniego at Agave Health, Inc., from October 4, 2013, through June 5, 2014. (Tr. 429, 430, 343, 435, 436, 437, 438, 439-41, 442-43, 445.) LISA Samaniego noted that Ms. Burkholder was working on coping skills and time management (437); and that she had improved (Tr. 438). Other providers noted that Ms. Burkholder's mood was better, and that her depression was well controlled. (Tr. 439-41, 442-43.)

On December 20, 2013, D.O. Tuvia Breuer, although indicating Ms. Burkholder's anxiety and depression were stable, nonetheless noted Axis I diagnoses of major depressive disorder, single episode severe with psychotic features, and adjustment disorder with anxiety. (Tr. 447-49.) She assessed a GAF score of 51.[17] On March 12, 2014, and May 21, 2014, NP Nicholas Farrey noted the same Axis I diagnoses, added an Axis II diagnosis of personality disorder, and assessed a GAF score of 55. (Tr. 439-41, 445-46.)

The ALJ generally referenced the Agave Health, Inc., records; *i.e.,* Exhibit B10F, as evidence that Ms. Burkholder's symptoms were improved, her mental status examinations were essentially unremarkable, and that her depression and anxiety were stable. (Tr. 19.)

### 5. The Family Connection, LLC

On August 19, 2014, Ms. Burkholder presented to The Family Connection, LLC, and initially met with Paula Raley. (Tr. 470.) Ms. Burkholder reported depressed mood, sleep disturbance, appetite disturbance, low energy, poor concentration, irritability, anxiety, and

---

[16] *See* fn. 9, *supra.*

[17] A GAF score of 51-60 indicates moderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (*e.g.,* few friends, conflicts with peers or co-workers). *See Am. Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders*, 32, 34 (4th ed. 2000).

parenting challenge.  (*Id.*)  Ms. Burkholder reported that her children were in CYFD custody.

(*Id.*)  Ms. Raley diagnosed an unspecified episodic mood disorder and planned to continue

Ms. Burkholder's clinical assessment.  (*Id.*)

On August 30, 2014, Ms. Burkholder saw CNP Carol Hunter, for "medication

management per CYFD requirement."  (Tr. 465-66.)  Ms. Burkholder reported that she was

> currently taking psychotropic medication.  She has 3 counts of child abuse and 3
> counts of neglect filed against her by CYFD.  Pt. was locked up for two and a half
> weeks and then released on probation for 18 months when another report was
> filed by an Open Skies employee who called CYFD for pt. "trying to break my
> child's leg."  Pt. then spent two months at the Women's Prison in Grants.  Pt. last
> had auditory hallucinations in January of 2014.  She endorses having problems
> controlling her anger.   There is no complaint of depression, poor sleep,
> hallucinations or suicidal/homicidal thinking.

(Tr. 465.)  CNP Hunter noted Ms. Burkholder's reported history of 15 to 20 suicide attempts

over the last 14 years, auditory hallucinations, and history of homicidal ideation towards her

sister-in-law.   (*Id.*)   On mental status exam, CNP Hunter indicated, *inter alia*, that Ms.

Burkholder's behavior was appropriate and cooperative, her mood was euthymic and angry, her

affect was congruent with her mood, her thought process was linear and organized, her thought

content was victimization and blaming others, her memory was intact, her insight and judgment

was poor, her impulse control was poor, and her reliability was poor.  (*Id.*)  CNP Hunter

diagnosed schizoaffective disorder and planned to increase Mr. Burkholder's mood stabilizer.

(Tr. 466.)

On October 25, 2014, Ms. Burkholder reported she was taking her medications as

prescribed, and that her irritability and depression were under control.  (Tr. 455.)

On November 8, 2014, Ms. Burkholder reported she had stopped taking her medication.

(Tr. 454.)  CNP Hunter cautioned that her tendency towards irritability and anger may return

while off the medication, but it was her right to see if therapeutic interventions alone would help.

(*Id.*)  Ms. Burkholder reported to CNP Hunter that she was scheduled for neuropsych testing and hoped it would help her with SSI.  (*Id.*)  CNP Hunter advised Ms. Burkholder that it was difficult to claim a mental health disorder when a fair medication trial had not been conducted, and that Ms. Burkholder had not been on mood stabilizers long enough to see if they would truly help. (Id.)  Nevertheless, Ms. Burkholder refused any medication at that time.  (*Id.*)

On November 22, 2014, Ms. Burkholder requested medication because she was going into a difficult situation over the holidays.  (Tr. 451.)  CNP Hunter prescribed Abilify.  (Tr. 452.)

The ALJ generally referenced The Family Connection records; *i.e.,* Exhibit B11F/2, as evidence that Ms. Burkholder's mental status examinations were essentially unremarkable.  (Tr. 19.)  The ALJ also specifically referenced CNP Hunter's November 8, 2014, note as evidence that Ms. Burkholder reported being symptom free despite being without therapeutic medications. (Tr. 20.)

### 6.     Neuropsychological Evaluation Report

On February 26, 2015, Ms. Burkholder, referred by CSW Kimberly Hieronymus of Open Skies Healthcare, presented to Robert J. Thoma, Ph.D., and Taryn E. Goff, Psy.D., for a neuropsychological evaluation to "better understand her strengths and limitations in an effort to provide adequate supports and resources."[18]  (Tr. 472-80.)  Ms. Burkholder reported a history of depression, auditory hallucinations, and a learning disability.  (Tr. 472.)  She reported that her children had been in and out of her custody since January 2013, and that she regained custody in November 2014.  (*Id.*)  Ms. Burkholder reported prior diagnoses of mood disorder, focusing on depression and anger; a history of auditory hallucinations; and a history of suicide attempts.  (Tr. 473-74.)  She stated she had daily mood swings of crying, sadness and anger, and that she had

---

[18] Ms. Burkholder told Drs. Thoma and Goff that this referral was also made to help with her disability application. (Tr. 472.)

difficulty sleeping.  (*Id.*)  Her current medications included Oxcarbazepine and Buspirone.  (Tr. 474.)  She reported taking Risperidone for the auditory hallucinations, but stopped taking it because she felt as though it made her symptoms worse.  (*Id.*)

Drs. Thoma and Goff administered the following measures according to standardized procedures as part of their neuropsychological evaluation: (1) clinical interview; (2) Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV); (3) Repeatable Battery for the Assessment of Neuropsychological Status (RBANS); (4) Beck Depression Inventory-Second Edition (BDI-II); (5) Beck Anxiety Inventory (BAI); (6) Personality Assessment Inventory (PAI); (7) Rey-15 Item Test; and (8) Independent Living Scales (ILS).  (Tr. 474.)  The procedures administered tested Ms. Burkholder's (1) motivation; (2) general intellectual ability; (3) attentional functions and processing speed; (4) learning and memory functions; (5) language processing; (6) visuospatial processing; (7) emotional/personality functioning; and (8) adaptive function and activities of daily living.  Drs. Thoma and Goff summarized that

> [c]urrent test results indicate overall intellectual abilities in the borderline range, with borderline verbal comprehension skills and perceptual reasoning skills.  Her working memory, and processing speed skills were both in the low average range. Neuropsychological test results indicated low average attention/concentration, and processing speed.  Learning skills were mixed, depending on their complexity, whereas her delayed memory skills are in the low average ranges.  Language functions are in the borderline and low average ranges.  Lastly, visuospatial skills are borderline and low average.   Adaptive functions are impaired in areas including managing money and social adjustment.

(Tr. 478.)  The doctors noted that "Ms. Burkholder answered all questions and appeared to fully participate in both the interview and in testing. . . appear[ing] to put forth a persistent effort across the procedures of [the] examination, so that these results are thought to reflect a reliable estimate of her current cognitive and emotional functioning.  (Tr. 474.)  Drs. Thoma and Goff diagnosed Major Depressive Disorder, General Anxiety Disorder, and Borderline Personality

Disorder.  (Tr. 478-79.)  They recommended that Ms. Burkholder (1) should continue her monthly psychotherapy sessions; (2) should work closely with an appointed case worker to secure safe and stable housing for herself and her children, and to assist her with filling out the required forms for income support benefits; (3) should have regular in-home parenting and behavioral guidance sessions for the well-being of her children; (4) should apply for disability benefits based on her mental health disabilities because it is unlikely she is able to perform successfully in an employment environment; and (5) should be referred for a sleep study.  (Tr. 479.)

The ALJ accorded "very little weight" to Drs. Thoma and Goff's opinion.  (Tr. 18, 20.) In doing so, the ALJ explained that

> [w]hile the evidence supports that the claimant has a learning disorder, there is no evidence to support that it affects her to the degree reflected here.  She appears to be attempting to portray herself in a worse light so that she may obtain disability benefits.  I have afforded very little weight to the opinions of these examiners, as they based their opinions largely on a one time examination and the claimant's self-reports, which for reasons discussed herein, are quite suspect.  In addition, other credible evidence of record does not support these findings.  I have, however, considered the claimant's learning disorder in establishing the residual functional capacity above.

(Tr. 18, 20.)

### 7.    Integrated Healthcare of NM

On March 6, 2015, Ms. Burkholder presented to Stephen Cheshire, Ph.D., of Integrated Healthcare of New Mexico.  (Tr. 489-91.)  Ms. Burkholder reported anxiety, depression, and insomnia, with symptoms of anergia, insomnia, hyperphagia, anhedonia, hopelessness, helplessness, dread, irritability, stomachaches and headaches.  (Tr. 489.)  She reported using a number of previously prescribed psychotropic medications including Zoloft, Abilify, Risperdal, and Seroquel.  (*Id.*)  She reported that Zoloft made her emotionally numb, Abilify activated

suicidal ideation, Risperdal had no effect, and Seroquel was marginally effective in helping her sleep. (*Id.*) On mental status exam, Dr. Cheshire observed, *inter alia*, psychomotor retardation, depressed mood, irritable, tense, anhedonic, anxious and depressed. (Tr. 490.) Dr. Cheshire planned to follow up with a psychotherapy and psychopharmacological evaluation, and to coordinate care with Ms. Burkholder's primary care physician regarding medication management and overall medical status. (Tr. 491.) Dr. Cheshire prescribed Wellbutrin. (*Id.*)

Ms. Burkholder saw Dr. Cheshire four more times on March 27, April 15, May 11, and June 3, 2015. (Tr. 482-83, 484-85, 486, 487-88.) Dr. Cheshire made certain medication adjustments due to side effects and persistent symptoms of depression, anxiety and irritability. (*Id.*) Dr. Cheshire consistently diagnosed major depression disorder, recurrent episode, moderate, and generalized anxiety disorder. (*Id.*)

The ALJ accorded partial weight to Dr. Cheshire's diagnoses. (Tr. 20.) The ALJ explained that Ms. Burkholder's complaints to Dr. Cheshire were not proportionate to the other evidence of record, and that a large portion of her problems stem from her parental responsibilities and other psychosocial stressors. (Tr. 20.)

## B. The ALJ Failed to Properly Evaluate Drs. Thoma and Goff's Neuropsychological Evaluation

Ms. Burkholder argues that the ALJ's reasons for rejecting Drs. Thoma and Goff's neuropsychological assessment are not valid because the ALJ recited no medical evidence for rejecting their assessment and failed to address the objective evidence contained in their report. (Doc. 24 at 5-8.) The Commissioner contends that although the ALJ did not cite to specific medical evidence to support his conclusion, he cited such evidence elsewhere throughout his decision. (Doc. 26 at 13.) The Commissioner further contends that having determined that Ms. Burkholder was not entirely reliable, the ALJ properly considered that Ms. Burkholder

appeared to be portraying herself in a worse light and it was a legitimate explanation for according less weight to Drs. Thoma and Goff's assessment. (*Id.* at 14.)

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional." *Hamlin*, 365 F.3d at 1215. Specifically, when assessing a claimant's RFC, an ALJ must explain what weight is assigned to each opinion and why. SSR 96-5p, 1996 WL 374183 at *5.[19] "An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion." *Hamlin*, 365 F.3d at 1215 (citing *Goatcher v. United States Dep't of Health & Human Servs.*, 52 F.3d 288, 290 (10th Cir. 1995)).[20] An ALJ need not articulate every factor; however, the ALJ's decision must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (quoting *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003)). Ultimately, ALJs are required to weigh medical source opinions and to provide "appropriate *explanations* for accepting or rejecting such opinions." SSR 96-5p, 1996 WL 374183 at *5 (emphasis added); *see Keyes-Zachary v Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012) (citing 20 C.F.R. § 416.927(e)(2)(ii))).

Here, the ALJ summarized Drs. Thoma and Goff's report and accorded their opinion very little weight because (1) Ms. Burkholder appeared to be portraying herself in a worse light so

---

[19] The Social Security Administration rescinded SSR 96-5p effective March 27, 2017, only to the extent it is inconsistent with or duplicative of final rules promulgated related to Medical Source Opinions on Issues Reserved to the Commissioner found in 20 C.F.R. §§ 416.920b and 416.927 and applicable to claims filed on or after March 27, 2017. 82 Fed. Reg. 5844, 5845, 5867, 5869.

[20] These factors include the examining relationship, treatment relationship, length and frequency of examinations, the degree to which the opinion is supported by relevant evidence, the opinion's consistency with the record as a whole, and whether the opinion is that of a specialist. *See* 20 C.F.R. § 416.927(c)(2)-(6) (evaluating opinion evidence for claims filed before March 27, 2017).

that she may obtain disability benefits; (2) it was a one-time examination; and (3) other credible evidence of record does not support these findings. (Tr. 18.) As an initial matter, citing to "other credible evidence," without more, is insufficient and fails to make clear to subsequent reviewers the reasons for the weight the ALJ accorded this opinion. Although the Commissioner argues the ALJ cited evidence elsewhere throughout the decision, the Court is nonetheless left guessing what evidence supports the ALJ's conclusion. Moreover, when the evidence is contradictory, as it is here, the Court cannot know which evidence was given what weight, or how the ambiguities were resolved. Therefore, to determine whether substantial evidence supports the conclusion, the Court would have to reweigh the evidence, which is precluded by law. *See Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (the Court will not reweigh the evidence of substitute its judgment for the Commissioner's).

Further, the ALJ's summary of the medical evidence elsewhere in his decision is incomplete and/or mischaracterized, and the ALJ excluded discussion of evidence that is at odds with his conclusion. *See Clifton v. Chater*, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (an ALJ, in addition to discussing the evidence supporting his decision, must also discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probably evidence he rejects). For example, the ALJ broadly concluded that the Partners In Wellness and Agave, Inc., records demonstrated that once CYFD returned her children, Ms. Burkholder's symptoms improved. (Tr. 18-19.) The records, however, demonstrate that even after her children were returned,[21] Ms. Burkholder continued to struggle with aggression, had difficulty with coping strategies, had real parenting deficits, lacked common sense, was impulsive, and made poor decisions. (Tr. 363, 366, 367, 369, 380, 387, 393, 407, 410, 412, 415, 422, 424.) The ALJ did not discuss this

---

[21] Ms. Burkholder indicated her children were returned the first time on April 19, 2013. (Tr. 376.)

evidence. On December 20, 2013, eight months after Ms. Burkholder's children were returned, D.O. Breuer of Agave, Inc., although noting improvement, nonetheless diagnosed Ms. Burkholder with major depressive disorder and adjustment disorder, and assessed a GAF score of 51, demonstrating moderate impairment. (Tr. 447-49.) NP Farrey similarly diagnosed Ms. Burkholder and assessed a GAF score of 55. (Tr. 439-41, 445-46.) The ALJ did not discuss this evidence. Ms. Burkholder then treated with Dr. Cheshire from March 6, 2015, through June 3, 2015, well after Ms. Burkholder's children were back in her custody for the second time,[22] and diagnosed her with major depressive disorder and generalized anxiety disorder. (Tr. 482-83, 484-85.) The ALJ improperly discounted this evidence.[23] On July 22, 2015, LISW Samaniego prepared an assessment in which she described Ms. Burkholder as impulsive, quick to anger, odd affect, immature for her age, and borderline intellectual functioning. (Tr. 497.) She diagnosed Ms. Burkholder with Mood Disorder and Borderline Intellectual Functioning, and assessed a GAF score of 50, demonstrating serious impairment.[24] (Tr. 497.) The ALJ did not discuss this evidence. *See generally*, *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1164 (10th Cir. 2012) (considering GAF scores and expressing "concern" with scores of 46 and 50); *Lee v. Barnhart*, 117 F. App'x. 674, 678 (10th Cir. 2004) (unpublished) ("Standing alone, a low GAF score does not necessarily evidence an impairment seriously interfering with a claimant's ability to work . . ." but "[a] GAF score of fifty or less, . . . does suggest an inability to keep a job.").

---

[22] CYFD took custody of Ms. Burkholder's children in January 2013 when Ms. Burkholder was first accused and convicted of contributing to the delinquency of a minor. (Tr. 472.) The children were returned to her in mid-April 2013. (Tr. 376.) A little over one year later, on May 29, 2014, Ms. Burkholder was arrested for violating probation due to child abuse. (Tr. 472.) She was sent to prison for two months and released on July 31, 2014. (*Id.*) She regained custody of her children in November 2014. (*Id.*)

[23] The ALJ accorded partial weight to Dr. Cheshire's treatment notes and stated, without more, that Ms. Burkholder's complaints were not proportionate to other evidence in the record. (Tr. 20.) However, the record demonstrates that Ms. Burkholder's complaints to Dr. Cheshire were consistent with her complaints to other providers of record; *i.e.,* The Family Connection records and Drs. Thoma and Goff's Neuropsychological Evaluation. *See* Section III.A.5 and 6, *supra*.

[24] *See* fn. 10, *supra*.

Thus, the ALJ's broad conclusion that the Partners in Wellness and Agave, Inc. records demonstrated that Ms. Burkholder's symptoms improved once her children were returned is not supported by the evidence.

Additionally, the ALJ mischaracterized certain evidence. The ALJ specifically stated that LISW Samaniego noted that she had seen significant improvement in Ms. Burkholder's anger and that she was demonstrating increased responsibility. (Tr. 18.) However, the treatment note the ALJ referenced; *i.e.,* Exhibit B7F/95, stated that *Ms. Burkholder reported* a significant improvement in her anger since completing anger management classes (Tr. 418). This distinction is significant because concurrent notes from the anger management therapist demonstrate that although Ms. Burkholder self reports that her actions have shown improved anger management, her reports of anger do not demonstrate much improvement and indicate that she is still aggressive in nature (Tr. 412, 415). The ALJ also pointed to treatment notes from The Family Connection, LLC, in which Ms. Burkholder stopped taking certain medications and reported feeling better. (Tr. 20.) The ALJ pointed to this as evidence that Ms. Burkholder was symptom free without therapeutic medications. (Tr. 20.) The ALJ's conclusion, however, ignores that Ms. Burkholder's rejection of psychotropic drugs was temporary and against medical advice, and that prior to and soon after Ms. Burkholder was seeking and taking medications as prescribed to treat her mood symptoms and anxiety. (Tr. 455, 456, 465-66, 472, 489-91.)

As to the ALJ's reliance on his having found Ms. Burkholder not credible as a reason to discount Drs. Thoma and Goff's opinion, the ALJ could properly discount Drs. Thoma and Goff's findings to the extent that they were based only on what Ms. Burkholder told them that was not consistent with the record as a whole. *Beard v. Colvin*, 642 F. App'x 850, 852 (10th Cir.

2016) (unpublished); *see also Hackett v. Barnhart*, 395 F.3d 1168, 1174 (10th Cir. 2005) (finding the ALJ was free to reject a treating psychologist's opinion where it appeared to be based on subjective complaints and isolated instances "rather than objective findings").  Here, however, Drs. Thoma and Goff administered multiple neuropsychological tests according to standardized procedures as part of their neuropsychological evaluation and signs of malingering were not present but rather Ms. Bukholder had put forth a persistent effort "so that these results are thought to reflect a reliable estimate of current cognitive and emotional functioning." (Tr. 475.) The ALJ ignored this and provided no explanation at all for rejecting objective results obtained from properly administered standardized neuropsychological testing measures.  This is error. *Beard*, 642 F. App'x at 852.

Lastly, discounting Drs. Thoma and Goff's opinion because it was based largely on a one time examination is not a legitimate reason in the face of the ALJ's other explanations.  In *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012), the Tenth Circuit held that a limited treatment relationship does not, *by itself,* form a proper basis for rejecting a medical-source opinion because "otherwise the opinions of consultative examiners would essentially be worthless, when in fact they are often fully relied on as the dispositive basis for RFC findings." *Id.*  Although the ALJ provided other reasons for according very little weight to Drs. Thoma and Goff's opinion, they are not supported by substantial evidence. And, because Drs. Thoma and Goff's medical-source opinion cannot be discounted solely on that basis, the ALJ's explanation for discounting their opinion is also erroneous.

In short, the ALJ failed to apply the correct legal standard in evaluating Drs. Thoma and Goff's neuropsychological assessment and his evaluation is not supported by substantial evidence.  This is reversible error.

C.    **The ALJ Failed to Properly Evaluate State Agency Psychological Consultant Opinion Evidence**

Ms. Burkholder argues that the ALJ's analysis of the State agency psychological consultant opinion evidence is also inadequate.  (Doc. 24 at 9-17.)  The Court agrees.  Here, the ALJ summarized State agency examining psychological consultant Dr. LaCourt's findings and concluded, without more, that he gave Dr. LaCourt's assessment some weight, "consistent with my decision herein."  (Tr. 19.)  This is not an explanation.  An ALJ is required to provide appropriate explanations for accepting or rejecting medical source opinions.  SSR 96-5p, 1996 WL 374183 at *5 (emphasis added); *see Keyes-Zachary,* 695 F.3d at 1161 (citing 20 C.F.R. § 416.927(e)(2)(ii))).    Further, the ALJ clearly rejected Dr. LaCourt's finding that Ms. Burkholder had marked limitations in her social interaction with supervisors, yet failed to explain why.  The ALJ also failed to explained why he adopted certain of Dr. LaCourt's other findings in the face of inconsistent medical evidence; *i.e.,* Drs. Thoma and Goff's neuropsychological evaluation, Dr. Cheshire's treatment notes, and LISW Samaniego's assessment.

As for the State agency nonexamining psychological consultant opinion evidence, the ALJ did not discuss their opinions at all, but concluded that

> [t]he opinions of state agency medical consultants are internally consistent and consistent with the evidence as a whole, therefore are entitled to significant weight (Exhibit B2A and B4A).  Thus, I have effectively adopted the residual functional capacity as determined by the State agency consultants.

(Tr. 22.)  Again, the ALJ failed to explain why he adopted Dr. Chiang's and Dr. Atkins' findings in the face of inconsistent medical evidence.  Moreover, the State agency nonexamiming medical consultants did not have the benefit of Ms. Burkholder's subsequent treatment history when they made their assessments; *i.e.,* records from Agave, Inc., and The

Family Connection, LLC; Drs. Thoma and Goff's neuropsychological evaluation; and Dr. Cheshire's treatment notes and diagnoses. Nowhere in his determination does the ALJ address how the more recent medical evidence of Ms. Burkholder's mental impairments and their impact on her ability to do work-related mental activities might have impacted the State agency nonexamining psychological consultant opinions. *See generally Jaramillo v. Colvin*, 576 F. App'x 870, 874 (10th Cir. 2014) (noting the significance of a recent physician's examination which found more limitations than an examination by another physician two years prior).

For the foregoing reasons, the ALJ did not apply the correct legal standard in evaluating the State agency psychological opinion evidence and his evaluations are not supported by substantial evidence. This is reversible error.

### D. <u>Remaining Issues</u>

The Court will not address Ms. Burkholder's remaining claims of error because they may be affected by the ALJ's treatment of this case on remand. *Wilson v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003).

## IV. <u>Conclusion</u>

For the reasons stated above, Ms. Burkholder's Motion to Reverse and Remand for Administrative Agency Decision for a Rehearing (Doc. 24) is **GRANTED.**

_____

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**